Filed 9/23/13  P. v. Melendez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B241864 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA375754) |
| v. | |
| WILFREDO MELENDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

Defendant Wilfredo Melendez appeals from a judgment of conviction entered after a jury found him guilty on two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)). The jury found not true the allegations of great bodily injury (*id.*, § 12022.7, subd. (a)) and commission of the crimes for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)(1)(C)). The trial court sentenced Melendez to state prison for a term of five years. Melendez argues on appeal that the trial court erred in refusing to instruct the jury on self-defense. We conclude the evidence did not warrant such an instruction and affirm the judgment.

# FACTUAL AND PROCEDURAL BACKGROUND

## A.     *The Crimes*

On the evening of September 1, 2010 Luis Godina was driving a light brown Honda north on 12th Avenue toward Venice Boulevard in Los Angeles, heading to the hardware store. He had four male passengers, including Edwin Bernal, who was sitting directly behind Godina. Godina's window was half-open; the other windows were closed. The rear windows and windshield were tinted.

Godina stopped at a stop sign at Venice Boulevard. As Godina waited for traffic to clear so he could make a left turn, he saw Melendez standing near some bushes to his right. Godina did not know Melendez, did not say anything to him, and did nothing to provoke him. Melendez crossed 12th Avenue behind the Honda. He suddenly turned and yelled, "Mara."[1] He ran back to the Honda and struck the rear window near where Bernal was sitting, shattering it. Melendez then struck the rear driver's side window by Bernal, shattering it as well. Bernal shouted to Godina, "Let's go. Let's go. Let's go.

---

[1]     "Mara" is short for the Mara Salvatrucha gang.

Take off." Godina attempted to drive away, but the car stalled when he tried to shift gears. Melendez then reached in through the half-open front driver's side window and stabbed at Godina with a knife, hitting him in the arm.

Godina finally managed to get the Honda started and drove away, with Melendez briefly chasing after the car. Godina drove to a nearby police station where he reported the incident. He was then taken by ambulance to the hospital, where he received stitches to close a three-inch deep knife wound in his arm.

   B.  *Melendez's Arrest and Interview*

Based on information obtained from Godina and a witness to the incident, Los Angeles Police Officer Jose Castaneda and Detective Carlton Jones believed that Melendez was the perpetrator. Detective Jones prepared a photographic lineup from which Godina identified Melendez. Melendez was then arrested.

On September 9, 2010 Detective Jones interviewed Melendez, who waived his *Miranda*[2] rights. Melendez initially denied any involvement in the incident. When Detective Jones said that a witness had identified him, Melendez said, "I'll be honest with you." Melendez said he was walking on Venice Boulevard after a D.U.I. class. He noticed a car following him and got nervous. The passengers had shaved heads and he thought they might be gang members. He heard a noise and saw the car windows had been rolled down. He thought the occupants of the car might shoot at him. He went up to the car and said, "Where you from?" Then he "just started breaking his windows." He hit the driver with his knife because he knew the driver would "want to get out of there and get free." The car then made a left turn on Venice Boulevard and took off.

Detective Jones asked whether the occupants of the car responded when Melendez asked where they were from. Melendez said, "Well, they didn't say anything, and so I

---

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

said 'M.S.'" Melendez admitted he was a member of the Tiny Winos clique of the Mara Salvatrucha gang.

Detective Jones then asked why Melendez approached the car rather than running away if he believed that the occupants might shoot at him. Melendez stated that he had been shot at before, so he knew the occupants of the car "didn't just cut me off and roll their windows down for no reason. They did it for a reason. So, you know, I'm already like close to the car. The only thing I can do is go break their windows, try to run out or something, you know . . . ." The detective pointed out that what Melendez was saying did not make sense because no one in the car had pointed a gun at Melendez or did anything to him, and because the only way Melendez could have broken the rear driver's side window was if the window was up. Melendez explained that it was the rear passenger side window that was rolled down.

Detective Jones asked Melendez if he realized that what he did was wrong, and Melendez responded, "It's self-defense." When the detective asked how it was self-defense, Melendez stated, "What do cops do? You see people like that, and they make a hand movement . . . you empty your clips, you know." Melendez explained, "I was scared. What am I going to do? I mean, come on. It's like to me life or death. What am I going to do? It's like instinct stuff." When Detective Jones mentioned writing down Melendez's version of the incident, Melendez said, "I'm just asking don't make me seem like the bad guy, you know. I'm just defending myself."


C.    *Gang Evidence*

A number of police officers confirmed that Melendez was a member of the Tiny Winos clique of the Mara Salvatrucha gang. Officers had encountered Melendez near Venice Boulevard and 12th Avenue, which is one block south of Mara Salvatrucha territory.

The expert witnesses on gangs testified about the primary activities of the Mara Salvatrucha gang and the gang's territory and symbols. The area of Venice Boulevard

and 12th Avenue borders on the territory of a number of gangs. Members of rival gangs in this area assault each other to gain control over the area.

###### D. *Melendez's Testimony*

Melendez's testimony at trial was essentially consistent with his statement to Detective Jones. Melendez testified that the car followed him down the street, drove away, then pulled up in front of him when he was about to cross 12th Avenue. After the two passenger side windows rolled down, "[a]ll of them, their attention went to me, so they were all staring at me. So when I seen that I knew something was going to happen. Then, I seen the front passenger guy, he was going to grab something on his waistband and I seen him look around and when I seen him look around I had a flashback from [a previous] incident where I had gotten shot up inside my truck. So I felt I had to react in seconds, either do something about it or maybe something was going to happen to me, get shot or something." Melendez acknowledged that no one in the car said anything and he did not see a gun or other weapon.

After his flashback, Melendez "ran behind the car and [he] broke the left window, the door window, and then [he] broke the rear windshield." He explained, "I felt I was going to get shot, so I felt I had to react in a second and try to break the windows and try to scare them off, to see if they would drive away." He used his fist to break the windows; the knife was still in his pocket. But "[a]fter I broke the rear windshield, I backed way a little bit to see if they would drive off, once I seen that they didn't drive off, that it didn't work, trying to scare them off, I deployed my knife."

When asked why he did not run away from the car, Melendez answered, "Because I've been chased before. I felt that if I would run, they would have chased me. I would have . . . got tired and they would have gotten me and shot me." When asked if he yelled "M.S." or "Mara," he said that when the car was starting to drive away, "I think I just said, 'Where you from?,' and then I yelled out 'M.S.,' I think." He did this "to scare them off and make them leave."

5

On cross-examination, Melendez acknowledged that gang members shout the phrase, "Where you from?" at people they believe are gang members, and that the phrase is associated with gangbanging. He insisted, however, that when he directed that phrase at the occupants of the car "[m]y intentions were not to bang on them, my intention was to scare them off."

E.    *Melendez's Request For a Jury Instruction on Self-Defense*

During a discussion on jury instructions, the trial court asked for the People's position on a self-defense instruction requested by Melendez, CALCRIM No. 3470.**3** The prosecutor objected on the ground that there was insufficient evidence to justify

---

**3**    CALCRIM No. 3470 provides in pertinent part: "Self-defense is a defense to *<insert list of pertinent crimes charged>*. The defendant is not guilty of (that/those crime[s]) if (he/she) used force against the other person in lawful (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another) if:

"1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] *<insert name of third party>*) was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully];

"2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was (imminent danger of bodily injury to (himself/herself/ [or] someone else)/[or] an imminent danger that (he/she/[or] someone else) would be touched unlawfully). Defendant's belief must have been reasonable and (he/she) must have acted because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful (self-defense/ [or] defense of another).

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed."

6

giving such an instruction: "There was no weapon that the defendant saw, there was no threat conveyed to the defendant. There was no weapon or expression of any type of harm." The prosecutor also noted that according to Melendez's version of the events, it was someone on the passenger side of the car who displayed threatening conduct, yet Melendez attacked people on the other side of the car. The prosecutor argued that "even assuming that that's the conduct that he observed and that was the conduct that posed the threat, which I'm not conceding, if he had a right to self-defense, it was against the source of the harm."

The prosecutor also commented on Melendez's claim that he attacked the car to force it to leave. The prosecutor argued that Melendez "doesn't have any legal right to force anyone to do anything in terms of being on a public street or not, so his reasoning does not give rise to self-defense, especially when, after attacking [Bernal], he then stopped, paused, went to another area of the car and went on the attack again, and in that intervening period there was absolutely no force used against him, no threat or the like."

The trial court noted that under CALCRIM No. 3470, even "[i]f nobody [in the car] had initiated force, I think the instruction is still appropriate if the defendant reasonably believed that he was in imminent danger, but it has to have been imminent danger from the person against whom he then used force." The court asked counsel for Melendez, "So where is the evidence in the record of that?" Counsel for Melendez responded: "The defendant believed that these individuals were acting in concert, and just as if [the prosecutor] was prosecuting a gang case where five individuals were in a car and did a drive-by shooting, there would be an allegation that these individuals were acting in concert or aiding and abetting and they would all be prosecuted." The court requested authority to support defense counsel's position and continued the discussion to a later break in the proceedings.

When the discussion resumed, counsel for Melendez cited *People v. Minifie* (1996) 13 Cal.4th 1055 and *People v. Pena* (1984) 151 Cal.App.3d 462 for the proposition that whether the defendant's conduct was reasonable or not was a jury question. In response to the trial court's specific inquiry, counsel for Melendez argued "it

7

is certainly reasonable for the defendant to associate the people on the left side of the vehicle with the people on the right side of the vehicle." He argued that Melendez attacked the driver to get the vehicle to leave, and that "if he had done something to one of the other occupants of the vehicle, that wouldn't necessarily motivate the driver to leave."

The trial court reviewed the law and the facts of the case, noting that "a bare fear is not enough. . . . The perceived threat must be imminent. Self-defense requires not only that the defendant honestly believe in the necessity of using force, but also, that the belief be objectively reasonable." The court stated that there was no evidence that either Bernal or Godina did anything to threaten Melendez. "There was no weapon, no gang signs, no words, no [gang] clothing," and "there was no testimony that the car ever swerved towards [Melendez]" or "tried to hit him in any way." The court concluded that "[t]o just come in and say, I saw some guys in a car and four of the five had shaved heads and they were looking at me and so I attacked the car, I just do not think that warrants a self-defense instruction so I'm going to respectfully decline the defense request for [CALCRIM No.] 3470 . . . ."

## DISCUSSION

### A. *Applicable Law*

The trial court must instruct the jury on a defense relied on by the defendant only if the defense is supported by substantial evidence. (See *People v. Watson* (2000) 22 Cal.4th 220, 222; *People v. Larsen* (2012) 205 Cal.App.4th 810, 823; *People v. Lee* (2005) 131 Cal.App.4th 1413, 1426.) "Substantial evidence in this context '" is 'evidence sufficient "to deserve consideration by the jury," not "whenever *any* evidence is presented, no matter how weak."'" [Citation.]' [Citation.]" (*Larsen, supra,* at p. 823, quoting from *People v. Wilson* (2005) 36 Cal.4th 309, 331.) "'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if

8

believed by the jury, was sufficient to raise a reasonable doubt . . . ." [Citations.]' [Citation.]" (*Larsen*, *supra*, at pp. 823-824, quoting from *People v. Salas* (2006) 37 Cal.4th 967, 982-983.) The court must resolve any doubts regarding the sufficiency of the evidence in favor of the defendant. (*Larsen*, *supra*, at p. 824.)

"'To be exculpated on a theory of self-defense one must have an honest *and* reasonable belief in the need to defend. [Citations.] A bare fear is not enough; "the circumstances must be sufficient to excite the fears of a reasonable person, and the [defendant] must have acted under the influence of such fears alone." [Citation.]' [Citation.]" (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1227; see *People v. Minifie*, *supra*, 13 Cal.4th at p. 1064 ["'[t]o justify an act of self-defense for [an assault charge under Penal Code section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him'"].) The reasonableness of the defendant's belief in the need for self-defense is evaluated objectively, and "reasonableness is determined from the point of view of a reasonable person in the defendant's position. The jury must consider all the facts and circumstances it might "'expect[] to operate on [the] [defendant's] mind . . . ." [Citation.]' [Citation.]" (*People v. Minifie*, *supra*, 13 Cal.4th at p. 1065; see *People v.* Humphrey (1996) 13 Cal.4th 1073, 1082-1083; *People v. Pena*, *supra*, 151 Cal.App.3d at p. 476.)

In addition, "[t]he threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]' [Citations.]" (*People v. Minifie*, *supra*, 13 Cal.4th at pp. 1064-1065.) For self-defense, "'the fear must be of imminent harm. "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury."' [Citations.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 551; see *People v. Saavedra* (2007) 156 Cal.App.4th 561, 568 ["fear of harm even in the near future is insufficient"].)

9

B.    *There Was No Substantial Evidence To Support an Instruction on Self-Defense*

Even under Melendez's version of the facts, there was no substantial evidence to support a self-defense instruction.  According to Melendez, the Honda followed him on Venice Boulevard, left, then pulled up in front of him on 12th Avenue.  The passenger side windows that were rolled down revealed four passengers with shaved heads, one of whom Melendez believed may have made motions suggesting he was reaching for a gun.  Melendez, however, made no effort to attack the man whom he perceived was a threat.  Instead, he ran behind the Honda to the other side of the car and smashed the rear windshield.  None of the occupants of the Honda had made any physical or verbal threats of any kind.  Melendez then backed off and waited to see if the car would drive away.  When it did not, he proceeded to smash the rear driver's side window.  Again, none of the occupants of the Honda had taken any action against Melendez.  Melendez then reached in through the driver's half-open window and stabbed at the driver, in order to make him drive away.

There was no substantial evidence to support an objectively reasonable belief that anyone in the Honda was about to inflict any bodily injury on Melendez at the time Melendez smashed the Honda's windows and then stabbed Godina.  Nothing Melendez perceived in the behavior of the occupants of the Honda at the moment of his attack justified his use of force against them.  Even if Melendez had initially perceived some kind of threat, it failed to materialize, yet he attacked the Honda and its occupants anyway.  There was no substantial evidence supporting an instruction on self-defense, and the trial court did not err in refusing to give the instruction.

## DISPOSITION

The judgment is affirmed.

SEGAL, J.*

We concur:

PERLUSS, P. J.

WOODS, J.

---

*   Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11